**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FC HIGHLANDS, LLC, THE HIGHLANDS OF MEMPHIS, LLC f/d/b/a HIGHLANDS OF MEMPHIS HEALTH & REHAB, ARIA HEALTH GROUP, LLC, SKYLINE MANAGEMENT GROUP, LLC, and SKYLINE OF MEMPHIS HEALTHCARE AND REHABILITATION CENTER, LLC, d/b/a THE HIGHLANDS OF MEMPHIS, and NORRISWOOD CARE & REHAB CENTER, LLC,**<br><br>**Defendants.** | ) | **No. 2:18-cv-02675-BCL-tmp** |

## REPORT AND RECOMMENDATION

On September 28, 2018, the Equal Employment Opportunity Commission ("the Commission") filed a complaint against five Defendants for employment practices in violation of the Americans with Disability Act ("ADA"):

(1) FC Highlands, LLC ("FC Highlands");

(2) The Highlands of Memphis, LLC f/d/b/a Highlands of Memphis Health & Rehab ("Highlands");

(3) Aria Health Group, LLC ("Aria");

(4) Skyline Management Group, LLC ("Skyline Management"); and

(5) Skyline of Memphis Healthcare and Rehabilitation Center, LLC, currently d/b/a The Highlands of Memphis and Norriswood Care and Rehab Center, LLC ("Skyline Healthcare").

(ECF No 1.) From 2011 through 2014, Evelyn Williams worked as a part-time weekend supervisor and charge nurse for Defendants' jointly owned nursing facility. According to the Commission:

> FC Highlands has owned the nursing facility since at least 2009. Highlands was the owner and licensed operator of the facility during a portion of Williams' employment and/or during the investigation of Williams' Charge of Discrimination. In early 2017, during the investigation of Williams' Charge of Discrimination, Skyline Healthcare replaced Highlands as the owner and licensed operator of the nursing facility. Aria managed the nursing facility during Williams' employment at the nursing facility. Skyline Management managed the nursing facility during the investigation of Williams' Charge of Discrimination.

(ECF No. 39 at PageID 115-16) (citation modified). The Commission alleged that Defendants violated the ADA in 2014 when they (1) failed to make reasonable accommodation for the disability of Evelyn Williams, and (2) discharged Ms. Williams because of her disability. (ECF No. 39-1 at PageID 114, 119.)

On May 15, 2019, the Commission moved for an Entry of Default as to all Defendants. (ECF No. 33.) The Clerk granted an Entry of Default as to all Defendants on May 16, 2019. (ECF No. 34.) On December 21, 2021, the Commission filed a Motion for Default Judgment. (ECF No. 39.) In its motion, the Commission sought an

award of backpay for Ms. Williams in the amount of $22,306.00, as well as $75,000.00 in compensatory damages and $25,000.00 in punitive damages. Id. at 11. The Commission calculated the backpay by multiplying Ms. Williams's declared hourly salary by her regular schedule for a period of unemployment lasting nine months. Id. at 12. The Commission sought compensatory damages in the amount of $75,000.00 because "[Ms.] Williams suffered stress, anxiety and/or embarrassment because of the disability discrimination," and "needlessly worried about how she would provide for herself and her children and was understandably upset about the obvious discrimination." Id. The Commission sought punitive damages in the amount of $25,000.00 because the Defendants acted with malice or reckless indifference by lying about the circumstances of Ms. Williams's termination. Id. at 13. Finally, the Commission requested permanent non-monetary relief wherein "Defendants and their successors are enjoined from denying a disabled employee's request for disability-related time off from work if the request is reasonable." Id. at 14.

On April 28, 2026, District Judge Brian Lea (who was newly assigned to the case) granted the Commission's Motion for Default Judgment. (ECF No. 46.) Judge Lea referred this matter to the undersigned for an evidentiary hearing and a report and recommendation concerning the issue of remedy, including damages. Id. On May 28, 2026, the undersigned held an evidentiary hearing.

Present at the hearing were Markeisha K. Savage and Donnie Snow, counsel for the Commission. Also present was Evelyn Williams, who testified at the hearing and whom the court finds credible.

In addition, Tyler Lester, owner of Skyline Management Group, LLC, appeared for the hearing in-person after receiving notice. The undersigned finds that Tyler Lester merely purchased the name "Skyline Management Group, LLC" after the action arose, bearing none of the assets nor liabilities associated with Skyline Management as named in this action. Therefore, neither Tyler Lester nor his company Skyline Management Group, LLC should be held liable for any damages.

After the hearing, the Commission filed its proposed findings of fact and conclusions of law, attaching three exhibits: A) a redacted transcript of the hearing, B) the declaration of attorney Markeisha K. Savage, and B-1) calculations relating to backpay and accompanying interest. The undersigned adopts the Commission's proposed findings of fact and conclusions of law, as modified below:

## I. PROPOSED FINDINGS OF FACT

### A. Back Pay Relief

1. Highlands of Memphis (Highlands) is a nursing home and rehabilitation center located in Memphis, Tennessee. (Exhibit 1, Redacted Evidentiary Hearing Transcript, May 28, 2026, at 14:1-10.)

2. Ms. Williams began working for Highlands in May 2011 as a licensed practical nurse. (Hearing Tr. at 14:14-17.)

3. Highlands employed over 200 employees during Ms. Williams's tenure. (Hearing Tr. at 27:18-20.)

4. In October 2011, Highlands promoted Ms. Williams to a part-time weekend supervisor position. (Hearing Tr. at 14:22-15:5.)

5. Ms. Williams worked 24 hours per week as a part-time weekend supervisor. (Hearing Tr. at 28:5-7.)

6. In addition to working as a part-time weekend supervisor, Ms. Williams also worked an average of 16 to 24 hours per week of mandatory overtime as an LPN Charge Nurse. (Hearing Tr. at 28:15-17; 29:5-8.)

7. Ms. Williams's overtime rate of pay was approximately $38 per hour. (Hearing Tr. at 29:9-11.)

8. Ms. Williams suffered a heart attack on April 16, 2014. (Hearing Tr. at 32:20-25.)

9. Ms. Williams was employed by Highlands when she suffered a heart attack. (Hearing Tr. at 31:12-14.) On or about April 21, Williams tried to meet with Highlands's Employer's Human Resources Representative to discuss using sick leave time and to hand-deliver her hospital release documents. (ECF No. 1 at PageID 7.) The Human Resources Representative refused to accept the hospital documents,

informed Williams that she had been terminated, and handed Williams a separation notice. Id.

10. At the time of termination, Ms. Williams had approximately 24 hours of PTO leave remaining. (Hearing Tr. at 30:14-19.)

11. After Highlands terminated Ms. Williams's employment, she applied for work at several nursing homes. (Hearing Tr. at 40:1-8.)

12. In February 2015, Ms. Williams obtained employment for the first time since Highlands terminated her employment. (Hearing Tr. at 40:23-24.)

13. Ms. Williams's first job after her termination from Highlands was as a nurse with Your Sharing Hands, a home health agency. (Hearing Tr. at 40:9-22.)

14. Your Sharing Hands paid Ms. Williams $19 per hour. (Hearing Tr. at 41:4-5.)

15. Ms. Williams worked 30 hours per week at Your Sharing Hands. (Hearing Tr. at 41:6-7.)

**B. Compensatory Damages**

16. Ms. Williams was angry about her termination because she was a dedicated employee who never received complaints from the patients' families or from Highlands. (Hearing Tr. at 42:18-43:4.)

17. After Highlands terminated Ms. Williams's employment, Ms. Williams suffered embarrassment because her landlord evicted her from her home. (Hearing Tr. at 42:18-43:5.)

18. After Highlands terminated Ms. Williams's employment, she and her three children had to move into a three-bedroom duplex with her mother and three other family members. (Hearing Tr. at 43:16-21.)

19. After Highlands terminated Ms. Williams's employment, Ms. Williams suffered embarrassment because her lender re-possessed her vehicle. (Hearing Tr. at 43:22-24.)

20. After Highlands terminated Ms. Williams's employment, she had to rely on the local food pantry and food stamps to feed herself and her children. (Hearing Tr. at 42:18-43:8.)

21. After Highlands terminated Ms. Williams's employment, she borrowed money from her family to pay her bills. (Hearing Tr. at 42:18-43:9.)

22. After Highlands terminated Ms. Williams's employment, she felt "less than a mom" because she could not provide for her family. (Hearing Tr. at 42:18-43:15.)

23. After Highlands terminated Ms. Williams's employment, her credit score dropped. (Hearing Tr. at 45:4-12.)

24. After Highlands terminated Ms. Williams's employment, she experienced stress, anxiety and a lack of sleep. (Hearing Tr. at 46:9-16.)

25. After Highlands terminated Ms. Williams's employment, she had to rely on the Angel Tree for Christmas gifts for her children. (Hearing Tr. at 46:17-47:4.)

**C. Punitive Damages**

26. When Ms. Williams had a heart attack in April 2014, Highlands's sick leave policy required her to notify the director of nursing of her impending absence at least four hours before her shift. (Hearing Tr. at 31:12-23.)

27. In accordance with Highlands's policy, Ms. Williams reported her heart attack and impending absence to Highlands's director of nursing, Karla Rodgers, on April 17, 2014. (Hearing Tr. at 32:7-33:9.)

28. Ms. Williams's report to Ms. Rodgers regarding her need to take sick leave was consistent with how Ms. Williams had reported her need to take sick leave in the past. (Hearing Tr. at 33:10-20.)

29. No one complained to Ms. Williams that her method of reporting her need to take sick leave was wrong or against company policy. (Hearing Tr. at 33:21-25.)

30. Ms. Williams also reported her heart attack and impending absence to the morning supervisor, Jennifer Chaffin. (Hearing Tr. at 34:20-35:1.)

31. Ms. Williams's report to Ms. Chaffin regarding her impending absence was consistent with how Ms. Williams had reported her impending absences in the past. (Hearing Tr. at 35:9-17.)

32. After the hospital released Ms. Williams, she went to Highlands and spoke with "Charity," in the Human Resources Department, about her sick leave and PTO. (Hearing Tr. at 38:1-8.)

33. Charity advised Ms. Williams that Highlands had already terminated her employment because she was a "no call-no show." (Hearing Tr. at 39:4-9.)

34. Ms. Williams advised Charity that she had previously spoken with Ms. Rodgers and Ms. Chaffin about her heart attack. (Hearing Tr. at 39:1-9.)

35. Charity was not persuaded by Ms. Williams's statement and advised she was told that Ms. Williams was a "no call-no show." (Hearing Tr. at 39:4-9.)

36. Before proceeding with the termination, Charity did not attempt to check with anyone regarding Ms. Williams's statement that she had advised Ms. Rodgers of her heart attack and absence. (Hearing Tr. at 39:17-21.)

37. Charity refused to look at Ms. Williams's medical paperwork and instead handed her the termination notice. (Hearing Tr. at 39:10-16.)

38. Highlands never trained Ms. Williams on the ADA. (Hearing Tr. at 36:11-15.)

39. Highlands never provided Ms. Williams with any policies related to the ADA. (Hearing Tr. at 36:16-20.)

40. Highlands never trained Ms. Williams on employment discrimination. (Hearing Tr. at 36:25-37:5.)

41. Ms. Williams is not familiar with any policy at Highlands related to employment discrimination. (Hearing Tr. at 37:6-8.)

42. Ms. Williams does not recall Highlands ever providing her with any policies related to employment discrimination. (Hearing Tr. at 37:9-12.)

43. Ms. Williams does not recall any management official at Highlands speaking with her about policies related to employment discrimination. (Hearing Tr. at 37:13-16.)

44. Ms. Williams does not recall any personnel or human resources official at Highlands speaking with her about policies related to employment discrimination. (Hearing Tr. at 37:17-20.)

**D. Injunctive Relief**

45. Again, in accordance with Highlands's policy, Ms. Williams reported her heart attack and impending absence to Highlands' director of nursing, Karla Rodgers, on April 17, 2014. (Hearing Tr. at 32:7-33:9.)

46. When Charity told Ms. Williams that her employment had been terminated because she was a "no call no show," Ms. Williams

advised her that she had previously spoken with Ms. Rodgers and Ms. Chaffin about her heart attack. (Hearing Tr. at 39:4-9.)

47. Despite Ms. Williams's pleas, Charity refused to investigate Ms. Williams's claim that she had suffered a heart attack and properly reported her disability-related absence. (Hearing Tr. at 39:10-21.)

## II. CONCLUSIONS OF LAW

### A. Backpay is an appropriate remedy in this case.

1. In discrimination cases, prevailing plaintiffs may be entitled to equitable relief, including backpay. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 533–34 (1999). Backpay is an equitable remedy that is "presumptively favored in employment discrimination cases." Suggs v. ServiceMaster Educ. Food Mgmt., 72 F.3d 1228, 1233 (6th Cir. 1996) (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975)). The Sixth Circuit has reasoned that prevailing claimants have a right to be made whole (i.e., placed in the position they would have been in but for discrimination) through an award of backpay. Rasimas v. Michigan Dep't of Mental Health, 714 F.2d 614, 626 (6th Cir. 1983). When a court finds that discrimination has taken place, the court has discretion to fashion remedies to make the victims whole, including discretion to award backpay. Isabel v. City of Memphis, 404 F.3d 404, 414 (6th Cir. 2005).

2. Here, the Commission has calculated backpay for Williams based upon her testimony. She testified that the doctor released her to return to work after she missed two weekends/four shifts. Therefore, she would have been available for work starting in May 2014. Ms. Williams further testified that she did not find work until December 2015.[1] Based upon Ms. Williams's testimony, the Commission calculated Ms. Williams's total back pay as $56,226.73 ($47,310.00 in backpay principal plus $8,916.73 in interest through May 16, 2019, when the Clerk granted an Entry of Default as to all Defendants).[2] The Commission asks the Court to award a total backpay amount of $56,226.73.

**B. Testimony solicited at the Evidentiary Hearing shows compensatory damages are appropriate.**

[1]While Ms. Williams testified that she worked for Sharing Hands before beginning her full-time role in December 2015, it would not be proper to deduct this amount from owed backpay. See NLRB v. Bannum Place of Saginaw, LLC, 97 F.4th 351, 362-63 (6th Cir. 2024) (citing NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir. 1985)) ("The general rule in labor cases is that 'an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position [lost] . . . and is suitable to a person of his background and experience.'"). The undersigned finds that Ms. Williams's job with Sharing Hands was not substantially equivalent to her prior job, where she was a part-time weekend supervisor and charge nurse and had a higher base salary with a substantial amount of overtime that paid twice the rate she made at Sharing Hands.

[2]During the hearing, the Commission stated it was seeking $22,306.00 in backpay. After considering Ms. Williams's testimony, the Commission updated the backpay amount to $56,226.73. (See Exhibits B and B-1) (calculation spreadsheet).

3. The Civil Rights Act of 1991 provides that an employer with "more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year" can be liable for up to $100,000.00 in compensatory and punitive damages plus backpay for each aggrieved individual. 42 U.S.C. § 1981a(b)(3). Courts may award compensatory damages to account for future pecuniary losses, emotional damages, suffering, inconvenience, mental anguish, and other nonpecuniary losses. Id.

4. Here, Ms. Williams is entitled to compensatory damages as the Commission has proven through Ms. Williams's testimony that the nursing home's unlawful actions caused Ms. Williams to suffer emotional distress. Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1215 (6th Cir. 1996) (citing Carey v. Piphus, 435 U.S. 247, 263-64 (1978)). A claimant's own testimony, along with the circumstances of a particular case, can suffice to sustain the Commission's burden in this regard. Id.

5. The Commission seeks compensatory damages of $75,000.00 for the emotional distress suffered by Ms. Williams as a result of this intentional discrimination. Ms. Williams suffered anger, stress, anxiety, lack of sleep and embarrassment when, among other things, Ms. Williams was evicted from her home; had her vehicle repossessed; was forced to rely on the local food pantry and food stamps to feed her family; had to move with her kids into a three-bedroom home with other family members; and felt ashamed that she

could not provide for her children. (Findings of Fact Nos. 16-25.) Such emotional distress warrants an award of compensatory damages.

**C. Punitive damages are appropriate because the nursing home acted with malice and reckless indifference.**

6. To recover punitive damages under the ADA, the Commission must introduce evidence proving the nursing home "engaged in a discriminatory practice . . . with malice or reckless indifference to the federally protected rights of [the] aggrieved individual[s]." 42 U.S.C. §1981a(b)(1). The inquiry for punitive damages with regard to "malice" and "reckless indifference" should be "on the actor's state of mind." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999). To have the requisite mental state, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law. . . ." Id. at 536. A plaintiff may prove the requisite mental state by: (1) showing that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws [but discriminated despite this knowledge] or (2) showing that the defendant's employees lied, either to the plaintiff or to the jury, to cover up their discriminatory actions. Sackett v. ITC Deltacom, Inc., 374 F. Supp. 2d 602, 619 (E.D. Tenn. 2005) (quoting Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001)). The Commission need only fulfill one of the two prongs to show Defendants' requisite mental state.

7. In this case, the nursing home lied to cover up its discriminatory actions by telling Ms. Williams she was terminated because she was a "no call-no show" and refused to review the hospital paperwork that she tried to share or check with the director of nursing and others who Ms. Williams said she had previously contacted after suffering the heart attack. (Findings of Fact Nos. 32-37.) Such malice and reckless indifference to Ms. Williams's rights warrant an award of punitive damages in the amount of $25,000.00.

**D. Defendants are jointly and severally liable.**

8. Joint and several liability "applies when there has been a judgment against multiple defendants." McDermott, Inc. v. AmClyde, 511 U.S. 202, 220–21 (1994). If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; however, the plaintiff may recover only once for the full amount. See Honeycutt v. United States, 581 U.S. 433, 447-48 (2017). Here, the Defendants are jointly and severally liable for all damages arising from their ADA violations. Plaintiff, therefore, can recover for the entire award from any Defendant.[3]

[3]The Commission spoke with Tyler Lester, owner of Skyline Management Group, LLC, after the evidentiary hearing. Lester represented that he only purchased the company name with the help of a third-party and did not purchase any assets or liabilities. Based upon Lester's representation, the Commission does not believe his company is the defendant Skyline Management Group

**E. Injunctive relief is appropriate to ensure future compliance with the law.**

9. The Sixth Circuit has stated, "upon a finding of any intentional employment discrimination, a district court possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law." See EEOC v. Frank's Nursery & Crafts, Inc., 177 F.3d 448, 467 (6th Cir. 1999) (quoting EEOC v. Wilson Metal Casket, 24 F.3d 836, 842 (6th Cir. 1994)). In crafting the injunction, the Sixth Circuit explains, "[]the proper scope of an injunction is to enjoin conduct which has been found to have been pursued or is related to the proven unlawful conduct." Wilson, 24 F.3d at 836. To guarantee no other disabled employee suffers the same unlawful discrimination as Ms. Williams, the undersigned recommends granting the Commission's request for injunctive relief by ordering any respective successor entities be subject to the following non-monetary relief: "Defendants and their successors are enjoined from denying a disabled employee's request for disability-related time off from work if the request is reasonable and does not pose an undue hardship."

**III. RECOMMENDATION**

---

associated with this litigation, and therefore does not seek to impose any liability against Lester or his company.

Accordingly, the undersigned recommends that the court deem the defendants jointly and severally liable, and award backpay in the amount of $56,226.73, compensatory damages in the amount of $75,000.00, and punitive damages in the amount of $25,000.00. The undersigned recommends that neither Tyler Lester nor his company Skyline Management Group, LLC be held liable for any damages. The undersigned further recommends that the court impose injunctive relief by requiring that all defendants and any respective successor entities be enjoined from denying a disabled employee's request for disability-related time off from work if the request is reasonable and does not pose an undue hardship.

Respectfully Submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

September 9, 2026
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**